IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

GEORGE HAMILTON,
           Plaintiff,

                                     CV 07-6278-PK

                                     FINDINGS AND
v.                                 RECOMMENDATION

MICHAEL J. ASTRUE,
Commissioner of Social Security,
                   Defendant.

PAPAK, Magistrate Judge:

       Plaintiff George Hamilton filed this action September 27, 2007, seeking judicial review

of a final decision of the Commissioner of Social Security denying his application for disability

insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of

the Social Security Act (the "Act").  This court has jurisdiction over Hamilton's action pursuant

to 42 U.S.C. §§ 405(g) and 1383(c).

       Hamilton argues that the Commissioner failed properly to assess his residual functional

Page 1 - FINDINGS AND RECOMMENDATION

capacity after completing step three of the five-step sequential process for analyzing a Social Security claimant's entitlement to benefits, and failed to carry his burden at step five of the process.  I have considered all of the parties' briefs and all of the evidence in the administrative record.  For the reasons set forth below, the Commissioner's decision should be affirmed.

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration.  *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner.  *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge considers the claimant's work activity, if any.  *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled.  *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b), 416.920(a)(4)(i), 416.920(b).  Otherwise, the evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments.  *See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  An

Page 2 - FINDINGS AND RECOMMENDATION

impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities and is expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c). The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b); *see also Bowen*, 482 U.S. at 141. If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d). If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an estimate of the claimant's capacity to perform sustained,

work-related, physical and mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a); *see also* S.S.R. No. 96-8p, 1996 SSR LEXIS 5.

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f). In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof is, for the first time, on the Commissioner.

At the fifth step of the evaluation process, some individuals limited by physical impairments to sedentary or light work must be found disabled, depending on their age and vocational education level. 20 C.F.R. § 404, Subpt. P, App. 2. The so-called "grids" contained in Tables 1 and 2 of Appendix 2 to Subpart P of Section 404 set forth the criteria for determining whether such a nondiscretionary finding must be made. In the event the grids do not mandate a finding of "disabled," the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether the claimant can perform any jobs that exist in significant numbers in the national economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566, 416.920(a)(4)(v), 416.920(g),

---

[1] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." S.S.R. No. 96-8p, 1996 SSR LEXIS 5.

416.960(c), 416.966.  If the Commissioner meets his burden to demonstrate that the claimant is

capable of performing jobs existing in significant numbers in the national economy, the claimant

is conclusively found not to be disabled.  *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§

404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566, 416.920(a)(4)(v), 416.920(g),

416.960(c), 416.966.  A claimant will be found entitled to benefits if the Commissioner fails to

meet his burden at the fifth step.  *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§

404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied

proper legal standards and his or her findings are supported by substantial evidence in the record.

*See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r for Soc. Sec. Admin.*, 359 F.3d 1190, 1193

(9th Cir. 2004).  "'Substantial evidence' means more than a mere scintilla, but less than a

preponderance; it is such relevant evidence as a reasonable person might accept as adequate to

support a conclusion."  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing*

*Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports

and the evidence that detracts from the Commissioner's conclusion."  *Id.*, *citing Reddick v.*

*Chater*, 157 F.3d 715, 720 (9th Cir. 1998).  The court may not substitute its judgment for that of

the Commissioner.  *See id.*, *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir.

2006); *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001).  If the ALJ's

interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible

[of] more than one rational interpretation."  *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir.

1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

**BACKGROUND**

Hamilton was born June 8, 1954.  Tr. 70, 290.[2]  He completed the eleventh grade, and did

not earn a General Educational Development credential or complete any kind of vocational

training.  Tr. 86.  He has worked in the past as a carpenter, ranch hand, logger, short-order cook,

and cook/bartender.  Tr. 63-69, 83-84, 92-93, 94-96, 97-99, 123-130, 138-139, 143.

On April 25, 2005, Hamilton filed an application for Title II disability insurance benefits,

Tr. 290-291, and on May 9, 2005, he filed an application for Title XVI Social Security insurance

benefits, Tr. 70-72.  In his DIB application he alleged a disability onset date of August 30, 2004,

Tr. 70, whereas in his SSI application he alleged a disability onset date of April 25, 2005, Tr.

290.  Hamilton describes his disabling medical conditions as "Back and leg/knee problems,

carpal tunnel, liver problems."  Tr. 82.  He asserts that these conditions limit his ability to work

as follows:  "Can't stand for more than 15 minutes.  My hands are numb most of the time.  Knees

prevent me from walking well enough to work."  Tr. 83.  He asserts that these conditions first

began to bother him in 1977, and left him unable to work due to "severe pain" as of August 30,

2004.  Tr. 83.

The earliest medical report appearing in the administrative record dates from July 24,

2000, at which time Hamilton complained of pain in his left knee following a work-related

incident in which the knee was hyper-extended.  Tr. 213-214.  Subsequently, in September 2000,

Hamilton was diagnosed with hepatitis B and C (although the record suggests that Hamilton may

---

[2]  Citations to "Tr." refer to the page(s) indicated in the official transcript of the
administrative record filed herein as Docket No. 12.

have first experienced symptoms from this condition during his early childhood), for which he received treatment at least through November 2000.  Tr. 205-206, 207-208, 209, 210, 211-212. It appears from the record that Hamilton has been asymptomatic in connection with his hepatitis condition since that time.

In January 2001, Hamilton consulted with his primary treating physician, Dr. Peter Howison, complaining of a tender lump on his back which had persisted for about three weeks. Tr. 204.  Dr. Howison diagnosed a sebaceous cyst, and prescribed Vicodin for the reported pain symptoms.  Tr. 204.  The following month, February 2001, an X-ray of Hamilton's lumbosacral spine revealed degenerative disk disease at the L5-S1 levels, a partially lumbarized S1 segment, and mild sclerosis, but no evidence of spondylolysis.  Tr. 219.  One year later, in February 2002, Hamilton again consulted with Dr. Howison, this time complaining of lower back pain following a work-related fall.  Tr. 202-203.  In May 2002, Dr. Howison saw Hamilton for what the physician referred to for the first time as "fairly chronic low back pain."  Tr. 201.  Noting that Hamilton "ha[d] difficulty getting up on his tiptoes," Dr. Howison described his patient as "unable or unwilling to take any steps forward" in that position.  Tr. 201.  Dr. Howison noted that Hamilton had "guarded flexion to 90 degrees, [al]though he ha[d] difficulty getting back up."  Tr. 201.  Dr. Howison described Hamilton as "an obese gentleman in moderate to severe distress from back pain," and prescribed Vicodin and muscle relaxants for the reported symptoms.  Tr. 201.

In January 2003, Hamilton complained of pain in his fingers, as to which Dr. Howison diagnosed carpal tunnel syndrome.  Tr. 199-200.  In February 2003, Dr. Howison recommended surgical evaluation in connection with Hamilton's carpal tunnel issues, Tr. 197-198, but Hamilton

did not act on the recommendation for more than a year, Tr. 191-192, 193-194.  In May 2003, Hamilton saw Dr. Carin Pluedeman to request something stronger than Vicodin for his lower back pain, indicating that "Extra Strength" Vicodin tablets were no more effective on him than aspirin.  Tr. 195-196.  Dr. Pluedeman described Hamilton's pain symptoms as "not particular[ly] a new exacerbation of the pain but just continually getting worse and worse. . . ."  Tr. 195.  She described his spinal and paraspinal tenderness as "[d]ifficult to evaluate," but noted that he was "exquisitely and overly tender to even light palpation across the lumbar muscles."  Tr. 195.  She further noted that he was "unable to stand on toes or heels of either leg but . . . walk[ed] with a normal gait."  Tr. 195.  Dr. Pluedeman prescribed muscle relaxants and steroids.  Tr. 195.

In May 2004, Hamilton had an apparent "recurrence" of his carpal tunnel syndrome symptoms, upon which he consulted with Dr. Mary Isham for a surgical evaluation.  Tr. 191-192, 193-194.  On September 1, 2004, one day after his alleged disability onset date, Hamilton failed to show up for an appointment with Dr. Isham to discuss carpal tunnel surgery further.  Tr. 189.  Hamilton's medical records do not reflect any change in Hamilton's medical condition at or around the alleged disability onset date.[3]

In January 2005, Hamilton told Dr. Howison that he had been fired from his last job due to having filed a workers' compensation claim, rather than that he had stopped working due to any allegedly disabling medical condition.  Tr. 187-188.  Hamilton complained of "aching and pain, especially before going to sleep[,] in both hands," which Dr. Howison opined was "significant."  Tr. 187.  Dr. Howison opined that this pain constituted a further recurrence of

---

[3]  However, Hamilton's DIB application does indicate that his spouse passed away on September 18, 2004, less than three weeks following the alleged disability onset date.  Tr. 70.

Page 8 - FINDINGS AND RECOMMENDATION

carpal tunnel syndrome.  Tr. 187-188.  The following week, Hamilton received bilateral wrist

injections for his carpal tunnel syndrome.  Tr. 186.

In April 2005, Hamilton filed an application for supplemental security income, Tr. 289-

291, and in May 2005 he filed for disability insurance benefits, Tr. 70-72.

On July 12, 2005, Hamilton woke up during the night with pain in his right hip.  Tr. 159-

161.  In a follow-up visit the following day, examining physician Dr. John Fuhrman observed

that Hamilton was "tender in the back with considerable degree of back spasm.  He ha[d]

virtually no motion there whatsoever.  I tried to elicit forward bending and hyperextension and he

really could not do it. . . .  He [wa]s too uncomfortable to attempt heel and toe walking."  Tr. 184.

Dr. Fuhrman suspected the pain symptoms were due to a herniated nucleus pulposas.  Tr. 184-

185.  X-ray imaging of Hamilton's hip and pelvis revealed no underlying pathology, Tr. 159-161,

162-167, but a lumbosacral spine MRI revealed a degree of bilateral neural foraminal

encroachment at the L3-4 level and spinal stenosis at the L3-4 and L4-5 levels, Tr. 157, 158, 183-

185, 288, specifically:

> Mild dextroconvex scoliosis . . . with its apex at the thoracolumbar junction.
> Approximately 2 mm of posterior displacement is present of L4 vertebral body
> with respect to L3 and L5 vertebral bodies.  Small diffuse posterior disk bulges
> are present at the level of L3-4 and L4-5.  Bilateral neural foraminal
> encroachments observed also at the level of L3-4.  Facet arthropathy and
> ligmentous hypertrophy are present at the level of L3-4, L4-5, and L5-S1.  Central
> spinal stenosis is present at the level of L3-4 and L4-5.  The majority of the
> cerebrospinal fluid surrounding the cauda equina at those levels have been
> effaced.  Chronic changes of degenerative disk disease are present at the level of
> L4-5.  There is no evidence for vertebral fracture.  The conus medullaris is within
> normal limits.

Tr. 158.  An epidural block was recommended, Tr. 157, 288, but Hamilton failed to follow

through with the recommendation, Tr. 181-182.

On August 12, 2005, Hamilton kept an appointment with Dr. Howison to request additional Vicodin to address his back pain. Tr. 181-182. In the course of this appointment, he indicated that over the preceding month he had taken many more Vicodin than had actually been prescribed to him, and conceded that he obtained the pills "in other ways." Tr. 181. Dr. Howison noted that Hamilton was "very difficult to examine because every little movement or touch evokes a painful response" and that he was "barely able to get up on his tip toes." Tr. 182. Dr. Howison opined in his chart notes that "Clearly this patient is disabled and in no way will be able to be gainfully employed in any endeavor in the near future." Tr. 182. Dr. Howison prescribed codeine and recommended that Hamilton consult with a chronic pain specialist. Tr. 182. Lab tests taken that same day revealed no abnormalities. Tr. 218.

On August 22, 2005, Hamilton arrived at the clinic on the wrong day for a scheduled epidural block procedure, and upon learning that he would not receive the procedure requested and received Vicodin in order "to get home." Tr. 155-156. Two days later, on August 24, 2005, Hamilton received an epidural steroid injection, but afterwards requested another "'shot' for pain." Tr. 152-154. Hamilton was instructed to wait and be monitored, but left the clinic after only five minutes of waiting. Tr. 152-154.

Hamilton continued to consult with his physicians in connection with back and wrist pain symptoms in September through November 2005. Tr. 172-174, 175-176, 177-180, 216, 217, 282-287. On September 8, 2005, Hamilton reported severe pain symptoms and indicated that he had already run through his codeine prescription. Tr. 177-180. Dr. Howison observed that although Hamilton was "grunting and displaying painful reactions" and was "barely able to get up on his tiptoes," he was able to flex to "almost 80 degrees." Tr. 177. Dr. Howison prescribed additional

Page 10 - FINDINGS AND RECOMMENDATION

codeine and recommended neurosurgery for Hamilton's carpal tunnel condition.  Tr. 178.  In October 2005, Dr. Howison prescribed MS Contin (morphine sulfate) and additional dosage of codeine to treat Hamilton's reported pain symptoms.  Tr. 175-176.  On November 11, 2005, an MRI of his spine revealed dextroconvex scoliosis and degenerative disk changes at the lower lumbar levels, disk space narrowing at L4-5 and L5-S1, and "very slight" retrolisthesis of L5, Tr. 217, as well as bilateral shoulder subacromial syndrome with rotator cuff arthropathy and AC joint arthritis, bilateral carpal tunnel syndrome, left knee osteoarthritis, Tr. 282-287.  When Hamilton reported bilateral hand pain on November 15, 2005, Dr. Howison recorded that "[e]xamination of both hands shows his hands to be quite dirty.  He must have been working with some soil."  Tr. 172-174.  On December 2, 2005, Hamilton reported back pain exacerbated by a fall, but "eloped" from the emergency room after Dr. Matthew Danigelis refused to administer an injection of narcotics.  Tr. 150-151.  That same day, Hamilton consulted with Dr. Howison and received from him an injection of dilaudid and an increased prescription for MS Contin.  Tr. 171.

In January 2006, Hamilton underwent a surgical carpal tunnel release procedure for his right hand.  Tr. 147-148.  The procedure was largely successful, eliminating all pain symptoms but with some lingering numbness reported.  Tr. 168, 169, 274-275, 276.  In March 2006 he underwent the same procedure for his left hand.  Tr. 269-273.  That procedure was apparently wholly successful.  Tr. 266, 267, 269-273.

On April 17, 2006, Hamilton underwent a comprehensive General Medical Examination administered by Dr. Kurt Brewster of Disability Determination Services.  Tr. 221-229.  Dr. Brewster reported that Hamilton "appear[ed] in [pain] even while seated and not moving" and

that he displayed "what could be considered an exaggerated pain response" during examination of his back.  Tr. 225, 228.  Dr. Brewster recorded that Hamilton had lumbar spine extension to 30 degrees and flexion to 90 degrees, and bilateral shoulder abduction to 150 degrees and flexion to 150 degrees.  Tr. 227.  Dr. Brewster opined that Hamilton could walk or stand for six hours within an eight hour day with 15 minute breaks every two hours, had no restrictions on sitting, could lift a maximum of 50 pounds and could lift 25 pounds frequently, had no restrictions on gross or fine movements, had frequent restrictions on wrist flexion and extension, and had occasional restrictions on reaching, grasping, and pulling.  Tr. 228-229.

       In May 2006, Hamilton was investigated for possible fraud in his DIB and SIS applications by the Cooperative Disability Investigations Unit.  Tr. 232-237.  The investigation was apparently triggered by Dr. Howison's suggestion that Hamilton appeared with dirty hands for an appointment on November 15, 2005, suggesting "a higher level of activity than his allegations might allow," and perhaps also by Hamilton's criminal record, which includes crimes of deception such as false swearing and forgery.  Tr. 233, 234.  The investigation did not, however, uncover any clear indicia of fraud.  Tr. 232-237.

       On May 12, 2006, the Administration notified Hamilton that he had been found "not disabled" in connection with each of his two claims.  Tr. 44-47, 293-297.  On May 15, 2006, Hamilton requested reconsideration of the adverse decision.  Tr. 42-43.  On July 18, 2006, the Administration notified Hamilton that its determination on reconsideration did not differ from its original determination.  Tr. 37-38, 299-301.  On July 21, 2006, Hamilton requested a hearing before an Administrative Law Judge, to appeal the Commissioner's adverse decision.  Tr. 35-36.

       Having missed several prior appointments, on August 11, 2006, Hamilton consulted with

Page 12 - FINDINGS AND RECOMMENDATION

Dr. Howison to request additional pain medications to "tide him over" until he could next refill

his existing prescriptions. Tr. 264-265. Ten days later, Hamilton complained of increased leg

pain, and received an increase in his MS Contin prescription. Tr. 262-263. Two months later he

received a still further increase to his MS Contin prescription. Tr. 260-261. On November 13,

2006, Hamilton reported improvement in his pain symptoms following the latest increase to his

pain medication prescription. Tr. 258-259. Nevertheless, on November 22, 2006, an X-ray of

Hamilton's right thumb revealed some irregularities and degenerative changes. Tr. 277.

On April 13, 2007, an appeal hearing was held before an ALJ. Tr. 305-357. The ALJ

heard testimony from Hamilton, Tr. 308-336, and a vocational expert, Tr. 337-356. Two weeks

later, on April 27, 2007, the ALJ issued a decision affirming the Commissioner's decisions, and

finding that Hamilton was not disabled. Tr. 14-16, 17-26. At step five of the five-step

sequential evaluation process, the ALJ found that Hamilton retained the residual functional

capacity to perform semiskilled, sedentary-exertional or light-exertional occupations existing in

significant numbers in the national economy such as food checker, gate guard, touch up

screener/circuit board assembler, and semiconductor assembler. Tr. 24-25. On this basis, the

ALJ concluded that Hamilton did not meet the criteria for disability. Tr. 18, 25-26.

Hamilton timely requested administrative review of the ALJ's decision, Tr. 11-12, and on

July 11, 2007, the Appeals Council declined his request, Tr. 6-10. In consequence, the ALJ's

decision became the agency's final order for purposes of judicial review. *See* 20 C.F.R. §

422.210(a); *see also*, *e.g.*, *Sims v. Apfel*, 530 U.S. 103, 107 (2000). This action followed.

## SUMMARY OF ALJ FINDINGS

At the first step of the five-step sequential evaluation process, the Administrative Law

Judge found in his April 13, 2007, opinion that Hamilton did not engage in substantial gainful activity at any time following his alleged disability onset date of August 30, 2004. Tr. 19. He therefore proceeded to the second step of the analysis.

At the second step, the ALJ found that Hamilton's medical impairments of lumbar degenerative disk disease with spinal stenosis and neuroforaminal encroachment at the L3-4 and L4-5 levels, subacromial impingement syndrome with rotator cuff arthropathy, right hip pain, history of left meniscus surgery, obesity, hepatitis C, and carpal tunnel syndrome were "severe" for purposes of the Act. Tr. 19. Because the combination of impairments was deemed severe, the ALJ properly proceeded to the third step of the analysis.

At the third step, the ALJ found that none of Hamilton's impairments was the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1. Tr. 20. The ALJ therefore properly conducted an assessment of Hamilton's residual functional capacity. Specifically, the ALJ found that Hamilton had:

> the residual functional capacity over an eight-hour period for lifting and/or carrying frequently 10 pounds and occasionally 20 pounds; holding and carrying briefly up to 40 pounds but no lifting of that amount from the floor; opportunity to change positions at least every half-hour; sitting without interruption up to 30 minutes; walking 100 yards; limited to being on his feet four to five hours in eight; if on concrete or similar hard surface no more than three hours total being on his feet; if standing, opportunity to change positions 15 to 30 minutes; occasional stooping and crouch; and no crawling.

Tr. 20. In reaching these conclusions, the ALJ considered all of the objective medical evidence in the record, as well as Hamilton's own statements as to his ability to perform the activities of daily living, the frequency and intensity of his pain and other symptoms, and the efficacy both of medical treatment and of other measures taken to alleviate his symptoms. Tr. 20-23.

At the fourth step of the five-step process, the ALJ found in light of his RFC that

Page 14 - FINDINGS AND RECOMMENDATION

Hamilton was unable to perform his past relevant work.  Tr. 23.

At the fifth step, the ALJ found in light of Hamilton's age, education, work experience, and RFC that there were jobs existing in significant numbers in the national and local economy that he could perform.  Tr. 24-25.  Relying in part on the testimony of an objective vocational expert, the ALJ cited as examples of unskilled to semi-skilled, sedentary to light-exertional jobs that Hamilton could perform despite the limitations listed in his RFC occupations including food checker (semi-skilled, sedentary), gate guard (semi-skilled, light exertion), touch up screener/circuit board assembler (unskilled, sedentary), and semiconductor assembler (semi-skilled, sedentary).  Tr. 25.  Based on the finding that Hamilton could have performed jobs existing in significant numbers in the national economy, the ALJ concluded that he was not disabled as defined in the Act at any time between August 30, 2004, and April 27, 2007.  Tr. 25-26.

## ANALYSIS

Hamilton challenges the Commissioner's assessment of his residual functional capacity.  Specifically, Hamilton argues that the Commissioner improperly rejected the opinion of his treating physician, Dr. Peter Howison, the medical opinions of two of Hamilton's examining physicians, and Hamilton's own lay opinion testimony, when he concluded that Hamilton was capable of light-exertional work, and was unrestricted in reaching, pushing, and pulling.

Hamilton further argues that the Commissioner failed to carry his burden at the fifth step of the five-step process in light of the alleged errors in his assessment of Hamilton's RFC, by finding that Hamilton had acquired transferable skills from his prior employment, and, in consequence of these assignments of error, by failing to find Hamilton disabled by application of

Page 15 - FINDINGS AND RECOMMENDATION

the grids codified within 20 C.F.R. § 404, Subpt. P, App. 2.

## I.    Residual Functional Capacity

### A.    Opinion of Treating Physician Dr. Howison

Peter Howison was Hamilton's treating physician for back pain and other medical

conditions from at least July 2000, Tr. 213-214, through at least February 2007, Tr. 280-281.  On

August 12, 2005, he opined that Hamilton was "[c]learly . . . disabled and in no way will be able

to be gainfully employed in any endeavor in the near future."  Tr. 181.  Subsequently, on May 10,

2007 – after the Administrative Law Judge had issued his opinion finding Hamilton not disabled

for purposes of the Act – Dr. Howison informed Hamilton's counsel that he did not believe

Hamilton could perform light work (lifting 20 pounds occasionally and 10 pounds frequently).

Tr. 303-304.

In weighing a claimant's medical evidence, the Commissioner generally affords enhanced

weight to the opinions of the claimant's treating physicians.  *See* 20 C.F.R. § 404.1527(d)(2).

Indeed, where a treating physician's medical opinion is well supported by diagnostic techniques

and is not inconsistent with other substantial evidence in the medical record, the treating

physician's opinion is accorded controlling weight.  *See id.*  Moreover, even where a treating

physician's opinion is contradicted by competent medical evidence, it is still entitled to deference.

*See id.*; *see also*, *e.g.*, *Orn v. Astrue*, 495 F.3d 625, 631-632 (9th Cir. 2007) (where a treating

physician's opinion is contradicted by medical evidence in the record it is "still entitled to

deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527"), *quoting*

S.S.R. No. 96-2p, 1996 SSR LEXIS 9.  In consequence, an uncontradicted treating physician's

opinion may only be rejected for "clear and convincing" reasons supported by evidence in the

Page 16 - FINDINGS AND RECOMMENDATION

record, and a contradicted treating physician's opinion may only be rejected for "specific and legitimate" reasons supported by evidence in the record. *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998), *citing Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

Notwithstanding the foregoing, no such deference is afforded a treating physician's opinion as to the ultimate issue of a claimant's disability or as to any other issue reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(e); *see also* S.S.R. No. 96-5p, 1996 SSR LEXIS 2. However, medical opinions from a treating physician or any other source may not be simply ignored, even when they bear upon issues reserved to the Commissioner, but rather must be evaluated to determine the extent to which they are supported by evidence in the record. *See* S.S.R. No. 96-5p, 1996 SSR LEXIS 2. Nevertheless, although the Commissioner is required to evaluate every medical opinion, the Commissioner is only required to discuss "significant probative evidence" in his detailed findings. *Vincent on behalf of Vincent v. Heckler*, 739 F.2d 1393, 1394-1395 (9th Cir. 1984) (controverted medical opinion found to be neither significant nor probative), *quoting Cotter v. Harris*, 642 F.2d 700, 706 (3rd Cir. 1981).

### 1.    Disability Opinion of August 12, 2005

Hamilton argues, first, that the ALJ improperly failed to address Dr. Howison's disability opinion of August 2005, and, in consequence, failed to provide specific reasons for rejecting that opinion. It is undisputed that Dr. Howison's disability opinion addressed an issue specifically reserved to the Commissioner. It was therefore entitled to no special deference, but nevertheless could not be simply ignored. However, while the Commissioner was required to evaluate the opinion, he was required to discuss it with particularity and provide specific reasons for rejecting it only if the opinion was both significant and probative.

Page 17 - FINDINGS AND RECOMMENDATION

The evidence in the record does not suggest that Dr. Howison's disability opinion was simply ignored.  To the contrary, at least some of the objective medical evidence referenced in Dr. Howison's disability opinion was expressly addressed in the Commissioner's findings, Tr. 21, indicating that the opinion was evaluated in some degree.

Moreover, analysis of the opinion and the medical record containing it does not suggest that the opinion was both significant and probative.  To the extent the conclusion expressed in the opinion is a legal one, it is entirely outside Dr. Howison's medical bailiwick, and therefore without probative value.  To the extent it constitutes a medical conclusion, it can add no probative value beyond that of the medical evidence itself.

Finally, even if the opinion were construed as both significant and probative, any error in omitting to discuss it with particularity in the Commissioner's detailed findings would necessarily be harmless, in that the findings contain numerous specific reasons for rejecting the conclusion, by whomever articulated, that Hamilton was completely disabled.  First, Dr. Howison's opinion is predicated, seemingly exclusively, upon Hamilton's subjective, self-reported pain symptoms secondary to a diagnosis of degenerative disk disease of the lumbar spine with spinal stenosis and foraminal encroachment at L3-4 and L4-5.  The ALJ found that Hamilton "repeatedly exaggerated his symptoms" of subjective pain, Tr. 23, citing to Tr. 282 (Dr. Parvin noted on November 11, 2005, that Hamilton reported experiencing pain "all over"), 284 (Dr. Parvin noted on November 11, 2005, that Hamilton demonstrated "florid" pain behavior and opined that his so-called Waddell signs – a group of physical signs, first described by Waddell *et al.* in 1980, that may indicate non-organic or psychological component to chronic low back pain and have historically been used to detect "malingering" patients reporting back pain – were "grossly

positive 4/4 with the '5th Waddell sign' of pain behavior"), 284-286 (Dr. Parvin opined on

November 11, 2005, that diagnosis of Hamilton's condition was rendered problematic by his

apparent "functional overlay" – essentially, misstatement of subjective symptoms – florid pain

behavior, and inconsistent responses), 182 (Dr. Howison reported on August 12, 2005, that

Hamilton was "very difficult to examine because every little movement or touch evokes a painful

response"), 179 (Dr. Kristina Dunn noted on September 8, 2005, that Hamilton was "quite

irritable throughout the exam; he [wa]s grunting and displaying painful reactions"), and 225-228

(Dr. Brewster noted on April 17, 2007, that Hamilton was "a well-developed white male, who

appear[ed] in constant distress throughout the exam," who "appear[ed] in [pain] even while

seated and not moving" and "show[ed] what could be considered an exaggerated pain response

when the back [wa]s examined").  Second, the ALJ referenced, at Tr. 23, Dr. Parvin's report in

which she expressly opined that the pathology of Hamilton's lumbar spine "does not appear to be

significant enough to be causing significant  radicular symptoms," Tr. 286.  Third, the ALJ found

that Hamilton's own report of his "daily activities [was] inconsistent with disability," in that

Hamilton was "independent in personal care," was able to "wash[] dishes, vacuum[], cook[] and

do[] laundry," "shop[ped] for food" and "[went] outside daily," and "socialize[d] with friends."

Tr. 23.  Harmless error cannot be grounds for overturning the Commissioner's decision.  *See*

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("[a] decision of the ALJ will not be

reversed for errors that are harmless"), *citing Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir.

1991).

For the foregoing reasons, the Commissioner's conclusion should not be disturbed on the

basis of the disability opinion of August 2005.

Page 19 - FINDINGS AND RECOMMENDATION

## 2.    Communication to Counsel of May 10, 2007

Hamilton's second argument is that the Appeals Council improperly discounted Dr.

Howison's communication of May 10, 2007 to Hamilton's counsel to the effect that Hamilton

was incapable of light exertional duties.  This medical opinion is contradicted by evidence in the

record, including most clearly the records from the comprehensive general medical examination

of April 17, 2006.  Tr. 221-229.  It is therefore entitled to deference, and may only be rejected for

specific and legitimate reasons supported by evidence in the record.  The opinion was not

addressed by the Administrative Law Judge, whose decision issued three weeks earlier on April

17, 2007, although it was addressed by the Appeals Council[4] in its notice of action denying

Hamilton's request for review of the ALJ's decision.  Tr. 7.  The Appeals Council stated as

follows:

> The new evidence is a medical source statement from your treating physician,
> Peter Howison, M.D., which states that you cannot do the full range of light work.
> This opinion cannot be given controlling or even sufficient weight to change the
> Administrative Law Judge's decision because (1) Dr. Howison was not presented
> with the same residual functional capacity (RFC) that is found in the decision –
> the RFC found in the decision is a reduced level of light work and includes a
> sit/stand option; and (2) Dr. Howison did not cite any clinical observations and
> only one test to support his conclusion – the MRI of the lumbar spine date[d] 07-
> 15-05 (Ex. 3F/12 [Tr. 158]).  Two state agency physicians also used that MRI in
> their conclusion that you could perform medium work (Ex. 7F [Tr. 238-244] and
> 10F [Tr. 257]); (3) The orthopedic spine surgery specialist, Dara Parvin, M.D., to
> whom Dr. Howison referred you, reviewed the MRI [and] said that "[The patient
> does have some pathology in the lumbar spine.  This does not appear to be
> significant enough to be causing significant radicular symptoms.]"  (Ex 13F4,5
> [Tr. 286]).

> * * *

---

[4]  The decision of the Appeals Council is not the subject of this court's judicial review, the
scope of which is strictly limited to the final decision of the Commissioner, in this case the
decision of the ALJ.  *See* 42 U.S.C. § 405(g); 20 C.F.R. § 422.210(a).

We found that this information does not provide a basis for changing the Administrative Law Judge's decision.

Tr. 7.

Preliminarily, I note that this court has authority to remand for further proceedings on the basis of evidence submitted following issuance of an ALJ's decision only upon a showing of good cause for the claimant's failure to produce the evidence earlier.  *See* 42 U.S.C. § 405(g); *see also Mayes v. Massanari*, 276 F.3d 453, 462 (9th Cir. 2001); *Clem v. Sullivan*, 894 F.2d 328, 332 (9th Cir. 1990).  It is well established that "[a] claimant does not meet the good cause requirement simply by obtaining a more favorable report from an expert witness once his claim is denied," but rather "must establish good cause for not seeking the expert's opinion prior to the denial of his claim."  *Clem*, 894 F.2d at 332, *citing Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985); *see also Weetman v. Sullivan*, 877 F.2d 20, 23 (9th Cir. 1989) (physician's "opinion [found] all the less persuasive since it was obtained . . . only after the ALJ issued an adverse determination").  Here, no such showing of good cause has been made, and the evidence in the record suggests no reason for concluding that Dr. Howison could not have issued a medical opinion prior to the ALJ's decision.

I further note that the medical source statement is not based on any new medical information, and essentially constitutes a weaker restatement of the August 12, 2005, opinion discussed above.  As such, almost all of the reasons cited above as adequate justifications for rejecting the August 12, 2005, opinion are applicable with at least equal force to the May 10, 2007, statement, including the evidence cited by the ALJ suggesting that Hamilton's self-reports of pain symptoms may have been exaggerated or otherwise untrustworthy, and that Hamilton's lumbar spine pathology could not have been the cause of significant radicular symptoms.

Page 21 - FINDINGS AND RECOMMENDATION

In addition, as noted by the Appeals Council, two reviewing physicians (Linda Jensen, M.D., and William Habjan, D.O.) reviewed Hamilton's entire medical record – necessarily including the July 15, 2005, MRI cited in the medical source statement – and nevertheless concluded that Hamilton was capable of performing medium-exertional work. Tr. 238-244, 257. The ALJ also took note, Tr. 20, of examining physician Dr. Brewster's opinion that, as of April 13, 2006, Hamilton was capable of lifting 50 pounds maximum, and 25 pounds frequently, Tr. 229.

For all of the foregoing reasons, the Commissioner's conclusion should not be disturbed on the basis of Dr. Howison's medical opinion of May 10, 2007.

### B.     Opinions of Agency Medical Consultants Drs. Brewster and Jensen

On April 17, 2006, Hamilton was examined by state agency physician Kurt Brewster, M.D. Tr. 221-229. Dr. Brewster concluded that Hamilton had "[f]requent restrictions on flexion/extension at the wrist, with occasional restrictions on reaching, grasping, pulling." Tr. 229. On May 11, 2006, non-examining state agency physician Linda Jensen, M.D., concluded on the basis of her review of Hamilton's medical records that he was limited in his upper extremities in his ability to push and pull. Tr. 246. Hamilton argues that the ALJ improperly disregarded this evidence in assessing his residual functional capacity, specifically in failing to find him to have the limitations indicated.

As with treating physicians, the controverted opinion of a non-treating, examining physician may only be rejected for specific, legitimate reasons. *See Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995). However, an ALJ must afford greater weight to the opinion of a treating physician than to other examining physicians. *See id.* at 1041. In addition, the reports of

Page 22 - FINDINGS AND RECOMMENDATION

non-examining state agency medical consultants are consistently given less weight than the opinions of treating physicians and, when contradicted by treating physician opinion, do not constitute "substantial evidence" that may properly be relied upon. *See*, *e.g.*, *Turpin v. Bowen*, 813 F.2d 165, 170 (8th Cir. 1987). Nevertheless, an ALJ may not ignore state agency medical consultant opinions and must "explain the weight given to these opinions in their decisions." S.S.R. No. 96-6p, 1996 SSR LEXIS 3.

Here, the ALJ provided specific, legitimate reasons for rejecting Dr. Brewster's upper extremity restrictions. First, he noted that restrictions as to range of motion in his wrists and other extremities were not supported by other objective medical evidence in the record, including the finding by examining orthopedist Dara Parvin that as of November 11, 2005, Hamilton's "[b]ilateral elbows, wrists and hands are with adequate and nontender range of motion throughout all distributions. No decreased tone or atrophy is appreciated and no instability is appreciated." Tr. 285. Second, he noted a normal range of motion determination of August 22, 2005, Tr. 155, and a normal range of motion determination of November 11, 2005, each inconsistent with Dr. Brewster's conclusion.

Although the ALJ was not required to address the opinion of reviewing state agency physician Dr. Jensen, each of the reasons offered in connection with Dr. Brewster's opinion is equally applicable to Dr. Jensen's.

For the foregoing reasons, the Commissioner's decision should not be disturbed on the basis of the medical opinions offered by Drs. Brewster and Jensen.

**C.    Hamilton's Testimony**

In a Claimant Pain Questionnaire completed June 16, 2005, Hamilton asserted that he

could be "up and active" for five to 15 minutes before needing rest, and that he could walk a maximum of "ma[y]be[] 100 yards" without resting. Tr. 89-90. In a Function Report completed January 17, 2006, Hamilton asserted that his pain symptoms no longer permitted him to work full time, to fish, to camp, or to hunt, Tr. 101, 104, to cook a "full" meal (although he prepares frozen dinners or sandwiches for himself daily), Tr. 102, or to do yard work, Tr. 103. He further asserted that he "sometimes" needs help making beds and doing dishes due to pain symptoms. Tr. 102. At the hearing before the Administrative Law Judge on April 13, 2007, Hamilton testified that following carpal tunnel surgery he did not yet have much strength in his hands and that he could not hold anything for very long at a time, Tr. 310, that he could not sit down in one spot without changing positions for more than 30 minutes at a time, Tr. 313, 314, that when driving he needed to stop every 15 or 20 minutes to move around, Tr. 313, that after walking 100 yards he needs to sit down for a while, Tr. 317, that he could lift 30 to 40 pounds maximum, Tr. 324, that he can only stand for 10 to 15 minutes at a time, Tr. 325, and that he could be on his feet a total of two to three hours in a day, Tr. 333. Hamilton argues, without specificity as to the particular findings objected to, that the ALJ improperly disregarded this evidence in assessing his residual functional capacity.[5]

When a claimant's medical record establishes the presence of a "medically determinable

---

[5] In fact, the ALJ afforded Hamilton's testimony "significant weight in finding that he has work restrictions far more limiting than propounded by any acceptable medical source. . . ." Tr. 20. Indeed, the "singular exception" as to which the ALJ did not credit Hamilton's testimony over that of his treating and examining physicians was his determination that Hamilton was not, as he testified, restricted from frequent wrist extension or flexion and occasional reaching, grasping, or pulling. Tr. 20. The ALJ determined that these restrictions were not supported by objective medical evidence, and that Hamilton's testimony as to these restrictions was "particularly suspect." Tr. 20.

Page 24 - FINDINGS AND RECOMMENDATION

impairment" that "could reasonably be expected to produce the [claimant's alleged] pain or other symptoms," the ALJ must evaluate the claimant's credibility in describing the extent of those symptoms.  20 C.F.R. § 404.1529.  In the event the ALJ determines that the claimant's report is not credible, such determination must be made "with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."  *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002), *citing Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (*en banc*).

In weighing a claimant's credibility, the ALJ may consider, *inter alia*, the "claimant's reputation for truthfulness, inconsistencies either in claimant's testimony or between h[is] testimony and h[is] conduct, claimant's daily activities, h[is] work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which claimant complains."  *Id.* (internal modifications omitted), *citing Light v. SSA*, 119 F.3d 789, 792 (9th Cir. 1997).  While a finding that a claimant lacks credibility cannot be premised solely on a lack of medical support for the severity of his pain, *see Light*, 119 F.3d at 792, *citing Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995), where the ALJ's credibility finding is supported by substantial evidence in the record, the finding will not be disturbed, *Thomas*, 278 F.3d at 959, *citing Morgan v. Commissioner of the SSA*, 169 F.3d 595, 600 (9th Cir. 1999).

Here, the ALJ provided specific, legitimate reasons for rejecting, at least in part, Hamilton's testimony regarding the severity of his pain-related limitations.  First, he noted that restrictions as to range of motion in his wrists and other extremities were not supported by objective medical evidence in the record, including the finding by orthopedist Dara Parvin that as of November 11, 2005, Hamilton's "[b]ilateral elbows, wrists and hands are with adequate and

nontender range of motion throughout all distributions.  No decreased tone or atrophy is appreciated and no instability is appreciated." Tr. 285.  Second, he discussed at length medical evidence including Hamilton's July 15, 2005, lumbosacral spine MRI, Tr. 157, 158, 288, a normal range of motion determination of August 22, 2005, Tr. 155, a normal range of motion determination of November 11, 2005, Tr. 217, a negative straight-leg raising test of August 12, 2005, Tr. 182, a near-normal lumbar-spine flexion examination of September 8, 2005, Tr. 179, and a normal lumbar-spine flexion/extension test, negative straight-leg raising test and finding of normal equal motor and strength in both legs of April 17, 2006, Tr. 217, and concluded that no lesser RFC was supported by any of this evidence.  Third, he discussed medical evidence (Tr. 179, 182, 225, 226, 228, 282, 284, 286) suggesting that Hamilton may have exaggerated the extent of his pain symptoms.  Tr. 23.  Fourth, he found that Hamilton's daily activities of washing dishes, vacuuming, cooking, and doing laundry were inconsistent with the limitations alleged. Tr. 23.

While the proffered reasons are not sufficient to establish conclusively that Hamilton had a propensity to exaggerate his symptoms, they do constitute specific and legitimate reasons supported by evidence in the record that are sufficient to permit the conclusion that the ALJ did not arbitrarily reject Hamilton's testimony.  Indeed, the record establishes that the ALJ afforded Hamilton's testimony significant weight, and discredited it only in part, based on legitimate concerns arising out of evidence in the record.  Because the ALJ's credibility determination is supported by substantial evidence in the record and was made pursuant to proper legal standards, his credibility finding should not be disturbed.

## II.    Step Five:  Existence of Jobs the Claimant Could Perform in the National Economy

As noted above, Hamilton argues that the Commissioner erred in finding that Hamilton had the residual functional capacity to perform more than purely sedentary work.[6]  In addition, Hamilton argues that the Commissioner erred in finding that he had acquired transferable skills from previous employment as a cook and bartender.  Under the grids set forth in Appendix 2 to Subpart P of Section 404, an individual closely approaching advanced age (aged 50-54, Hamilton's age range) with less than a high school education, limited by physical impairments to sedentary work, and lacking transferable skills despite previous work experience in skilled or semi-skilled jobs, would be conclusively disabled, *see* 20 C.F.R. § 404, Subpt 9, App. 2 at 201.10, whereas such an individual with transferable skills would be considered not disabled, *see* 20 C.F.R. § 404, Subpt 9, App. 2 at 201.11.  Similarly, an individual closely approaching advanced age with less than a high school education, lacking transferable skills despite previous work experience in skilled or semi-skilled jobs, but only limited to light, rather than to sedentary, work, would be considered not disabled.  *See* 20 C.F.R. § 404, Subpt 9, App. 2 at 201.25.  Thus, Hamilton's argument can only succeed if the Commissioner erred both in concluding that Hamilton was capable of more than sedentary work and in concluding that Hamilton lacked transferable skills.

Hamilton argues that the Commissioner was not entitled to conclude from the evidence in the record that he had acquired transferable skills from his previous bartending work.  The bartending experience came from a position he held in 1996 at Pastime Sports Center as a

---

[6]  For reasons set forth above, this finding should not be disturbed on the basis of any of the arguments Hamilton puts forward.

"bartender & cook." Tr. 123.  This was a part-time position that Hamilton held for "a couple of months, maybe."  Tr. 335.  The Dictionary of Occupational Titles lists bartending as a job requiring 1-3 months to learn the job.  The ALJ concluded that working a part-time job as a combination bartender and cook was the equivalent of working as a bartender full-time for one month, and thus sufficient to establish that Hamilton had transferable skills from previous employment.  Tr. 336-337.  This finding is, at least minimally, supported by substantial evidence in the record, and therefore should not be disturbed.

Because the Commissioner's relevant findings – that  Hamilton had the residual functional capacity to perform more than purely sedentary work and that he had acquired transferable skills from his previous employment – should not be disturbed, the argument that Hamilton is conclusively disabled pursuant to the grids is unfounded.  The Commissioner's decision should therefore remain undisturbed.

## CONCLUSION

For the reasons set forth above, I recommend that the Commissioner's final decision be affirmed.  A final judgment should be prepared.

## SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review.  Objections, if any, are due October 17, 2008.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.  If objections are

/ / /

/ / /

/ / /

Page 28 - FINDINGS AND RECOMMENDATION

filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

Dated this 2nd day of October, 2008.

_/s/ Paul Papak_____
Honorable Paul Papak
United States Magistrate Judge